Cody R. Padgett (SBN 275553)
Cody.Padgett@capstonelawyers.com
Majdi Hijazin (IL SBN 6284879) (*pro hac vice* forthcoming)
Majdi.Hijazin@capstonelawyers.com
Nate N. Kiyam (SBN317677)
Nate.Kiyam@capstonelawyers.com
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:      (310) 556-4811
Facsimile:      (310) 943-0396

Russell D. Paul (*pro hac vice* forthcoming)
rpaul@bm.net
Amey J. Park (*pro hac vice* forthcoming)
apark@bm.net
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (215) 875-3000
Fax: (215) 875-4604

Attorneys for Plaintiffs

[Additional Counsel Listed on Signature Page]

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY MASTERS and MICHELLE FRANK-CROWDER individually, and on behalf of a class of similarly situated individuals,<br><br>                Plaintiffs,<br><br>        v.<br><br>HYUNDAI MOTOR AMERICA., INC., a California corporation, KIA MOTORS AMERICA, INC., a California corporation, HYUNDAI MOTOR COMPANY, a South Korean corporation, and KIA MOTORS CORPORATION, a South Korean corporation,<br><br>                Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR:**<br>(1) Violations of California's Unfair Competition Law<br>(2) Beach of Express Warranty under California Law<br>(3) Violations of the Song-Beverly Act Implied Warranty<br>(4) Violations of the Illinois Consumer Fraud Act<br>(5) Breach of Express Warranty under Illinois Law<br>(6) Breach of Implied Warranty under Illinois Law<br>(7) Breach of Warranties under the Magnuson-Moss Warranty Act<br>(8) Fraudulent Concealment/Omission<br>(9) Unjust Enrichment<br><br>**DEMAND FOR JURY TRIAL** |

1.      Plaintiffs Timothy Masters and Michelle Frank-Crowder ("Plaintiffs") bring this action against Defendants individually and on behalf of all persons in the United States who purchased or leased any Hyundai or Kia-brand vehicle equipped with a T-GDI 1.6L Gamma II engine, including the 2020-2024 Hyundai Sonata and 2021-2024 Kia K5 vehicles ("Class Vehicles" or "Vehicles").

2.      Defendants Hyundai Motor America, Inc. ("HMA"), Hyundai Motor Company ("HMC") (together with HMA, "Hyundai"), Kia Motors America, Inc. ("KMA"), and Kia Motors Corporation ("KMC") (together with KMA, "Kia," and Kia collectively with Hyundai, "Defendants") designed, manufactured, marketed, distributed, sold, warranted, and/or serviced the Class Vehicles. Plaintiffs allege as follows:

**INTRODUCTION**

3.      This is a consumer class action concerning the production, marketing and sale of dangerously defective Class Vehicles and a failure to disclose material facts and a safety concern to consumers.

4.      Defendants manufactured, marketed, distributed, and/or sold the Class Vehicles without disclosing that the Class Vehicles' fuel systems, including the evaporative emissions control system ("EVAP system") and the Engine Control Module ("ECM"), were defective.

5.      Specifically, Plaintiffs allege that the fuel systems, including the EVAP system and ECM, are defective in that they are designed and manufactured, assembled, and/or installed (aka workmanship) in a manner that prevents the gas vapors in the system as well as air from the outside from being properly directed towards the intake manifold, allowing those vapors instead to build up in the fuel tank and other areas of the fuel system. As a result, the vehicle experiences poor engine performance, misfires, rough idling, a lack of motive power, a fuel cap that is hard to remove, a noticeable fuel odor in the interior compartment, difficulty filling the gas tank, expansion of or distortion of the shape of the fuel tank, and increased emissions (the "Fuel System Defect" or "Defect"). In particular, the distortion of the fuel tank is often so great it causes sudden and loud popping noises and damages other parts of the vehicle, including dislodging the backseat and bending the vehicle's frame.

CLASS ACTION COMPLAINT

6.      The Fuel System Defect presents a significant safety hazard. Drivers, including Plaintiffs, are unable to properly fuel their vehicle, can lose power while driving, be distracted while driving, and inhale excess emissions while in the vehicle. The Fuel System Defect endangers drivers, passengers, pedestrians, and other vehicles because it makes accidents more likely, particularly when the vehicle loses power and suddenly slows while in motion. Moreover, the distortion of the gas tank is a particularly dangerous condition, one which if not immediately remedied, can lead to fuel leaks and a fire or explosion. Finally, the Fuel System Defect can put passengers in danger of injury when it manifests in sudden popping and dislodging of the Class Vehicles' rear seats.

7.      Defendants sold the Class Vehicles with a full vehicle 5-year/60,000-mile New Vehicle Limited Warranty ("NVLW") that purports to cover the fuel system. All Class Vehicles are also covered by an Emissions Warranty ("EW") of 8-years/80,000-mile for major components of the fuel system, including the Engine Control Module ("ECM"), Catalytic Converter, and On-board Emissions Diagnostic Device ("OBD-II"). However, owners and lessees often have complained about problems resulting from the Fuel System Defect that require repair or replacement both within and just outside the NVLW and/or EW period and that they were charged for repair and/or alternative transportation even when within the warranty period. Further, many Class Members are without their vehicles for months, as Defendants promise them remedies which never materialize, including buybacks. This is evidenced by Class Member reports to the National Highway Traffic Safety Administration ("NHTSA"), which demonstrate that Defendants' authorized dealerships are communicating with HMA and KMA about the problems in these vehicles and that those with distorted gas tanks are impossible to repair.

8.      The Fuel System Defect is inherent in each Class Vehicle and was present at the time of sale.

9.      Discovery will show that, since 2021, if not earlier, Defendants have been aware the Class Vehicles' fuel systems would prematurely fail, require critical component replacement, including replacements just outside of warranty, that the replacement components

CLASS ACTION COMPLAINT

installed would be equally as defective as the originals, and that the fuel system would cause the symptoms of the Defect described above (misfires, running roughly, fuel odors, difficulty fueling and fuel tank distortion), yet Defendants continued to equip the Class Vehicles with defective fuel systems. Further, Defendants often claim that the warranties they provided with the vehicles do not cover the Defect, forcing consumers to pay out of pocket. Moreover, Defendants not only refused to disclose the alleged Defect to consumers, they also actively concealed, and continue to conceal, their knowledge concerning the true extent and associated safety risk of the Fuel System Defect.

10. Defendants undertook affirmative measures to conceal the Defect and its associated safety risk through, among other things, Voluntary Emissions Customer Service Campaigns issued to owners or lessees which do not detail the Defect in its entirety or even mention the associated safety risk.

11. Defendants had superior and/or exclusive knowledge of material facts regarding the Defect due to their pre-production testing, design failure mode analysis, aggregate part sales, consumer complaints about the Defect to Defendants' dealers, which are their agents for vehicle repairs, customer complaints made directly to Kia and Hyundai, dealer audits, aggregate warranty information, consumer complaints to and resulting notice from the National Highway Traffic Safety Administration ("NHTSA"), early consumer complaints on websites and internet forums, dealership repair orders, among other internal and external sources of information about the problem.

12. The Fuel System Defect is material because, *inter alia,* it poses a safety risk. As attested by Class Members in complaints to the National Highway Traffic Safety Administration NHTSA, and other online forums, the Defect can cause loss of motive power, engine misfires, sudden popping and dislodging of rear seats, and an expanded and/or distorted fuel tank, greatly increasing risk of collision as the driver struggles to control their vehicle.

13. Discovery will show that, in an effort to conceal the Defect, Defendants have instructed dealers to tell consumers their vehicles are "operating normally" or "operating as intended" when they are not, or to falsely claim that the vehicle was in a collision or fueled

CLASS ACTION COMPLAINT

improperly. This is a common practice in the automotive industry. By denying the existence of a defect, manufacturers can play on consumers' lack of technical expertise and avoid implementing potentially costly fixes for years, or at least until the vehicles are out of warranty. When remedial measures are taken, they are often through the issuance of service bulletins provided to dealers only or customer service campaigns that are narrowly crafted and underinclusive, as occurred here and set forth below. This is inferior to a formal recall, which is monitored by NHTSA.

14. Had Defendants disclosed the Fuel System Defect, Plaintiffs and Class Members would not have purchased the Class Vehicles, would have paid less for them, or would have required Defendants to replace, or pay for the replacement of, the defective fuel systems with non-defective versions before their warranty periods expired. Thus, Defendants' failure to disclose has injured Plaintiffs and Class Members and conferred an unjust substantial benefit upon Defendants.

<b>THE PARTIES</b>

**Plaintiff Timothy Masters**

15. Plaintiff Masters is a California citizen domiciled in Sacramento, California.

16. On or around September 5, 2022, he purchased a new 2023 Hyundai Sonata equipped with a T-GDI 1.6L Gamma II engine at Folsom Lake Hyundai, an authorized Hyundai dealership located in Folsom, California.

17. Passenger safety and reliability were important factors in Plaintiff Master's decision to purchase his vehicle. At the dealership, Plaintiff Masters reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Plaintiff Masters also discussed the safety features of the vehicle with dealership personnel, who made no reference to the Fuel System Defect. Plaintiff Masters believed that the 2023 Hyundai Sonata would be a safe and reliable vehicle.

18. Defendants' omissions were material to Plaintiff Masters. Had the Hyundai Defendants disclosed their knowledge of the Fuel System Defect before he purchased his vehicle, Plaintiff Masters would have seen and been aware of the disclosures. Furthermore, had

CLASS ACTION COMPLAINT

he known of the Fuel System Defect, Plaintiff Masters would not have purchased his vehicle or would have paid less for it.

19.    At all times, Plaintiff Masters properly maintained his vehicle.

20.    On or about March 18, 2024, the check engine light illuminated while he was driving his vehicle. He dropped the vehicle off at Folsom Lake Hyundai, which evaluated the vehicle on March 21, 2024. He was told that the ECM would need to be replaced. This attempted repair took weeks to complete, and his vehicle was not returned to him until April 17, 2024.

21.    On April 21, 2024, the check engine light illuminated again as he pulled into a gas station. He attempted to fill the vehicle's fuel tank, but gasoline sputtered back of the tank. Less than a gallon of gas ultimately went into the car.

22.    On April 22, 2024, Plaintiff Masters had the vehicle towed back to the Folsom dealership, which removed the backseat of his vehicle and told him the floorboard was damaged. They told him that this occurred because the vehicle had supposedly been in a collision and refused to perform a repair.

23.    The next day, he had the vehicle taken to Caliber Collision, located in Folsom California for inspection. He also contacted his vehicle's insurance carrier, Farmers' Insurance, to file a claim for the damage. Both Caliber Collision and the insurance adjusted sent by Farmers' Insurance inspected the vehicle and found there was no damage to the undercarriage of the vehicle, disproving that the vehicle had been in collision. Both Caliber Collision and the insurance adjuster concluded that the vehicle had not been in a collision.

24.    Plaintiff Masters called both HMA's customer service and the California Bureau of Auto Repair to complain about the dealership's handling of his vehicle. HMA's customer service advised him to bring the vehicle back to Hyundai Folsom and give them the claim number provided by HMA. Plaintiff Masters returned his vehicle to Hyundai Folsom, who kept the vehicle for a couple of weeks before calling him. He was told that one of HMA's chief engineers in their technician training course had looked at his vehicle and agreed that the damage was in no way caused by a collision. HMA finally agreed to fix his vehicle, but the vehicle was only returned to Plaintiff Masters with the purported repair in late September.

CLASS ACTION COMPLAINT

25. At all times, Plaintiff Masters, like all Class Members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiff Michelle Frank-Crowder**

26. Plaintiff Frank-Crowder is an Illinois citizen residing in Joliet, Illinois.

27. On or around June 20, 2022, Plaintiff Frank-Crowder purchased a new 2022 Kia K5 equipped with a T-GDI 1.6L Gamma II engine from Volvo Kia Joliet, an authorized Kia dealership located in Joliet, Illinois.

28. Plaintiff Frank-Crowder purchased her vehicle primarily for personal, family, or household use.

29. Passenger safety and reliability were important factors in Plaintiff Frank-Crowder's decision to purchase her vehicle. Before making her purchase, Plaintiff Frank-Crowder researched the 2022 Kia K5 online by "Googling" the vehicle and performing online research. At the dealership, Plaintiff Frank-Crowder also reviewed the vehicle's Monroney Sticker or "window sticker," which listed official information about the vehicle. Plaintiff Frank-Crowder also test drove the vehicle and spoke with dealership personnel, who made no reference to the Fuel System Defect. Plaintiff Frank-Crowder believed that the 2022 Kia K5 would be a safe and reliable vehicle.

30. Defendants' omissions were material to Plaintiff Frank-Crowder. Had the Kia Defendants disclosed their knowledge of the Fuel System Defect before she purchased her vehicle, Plaintiff Frank-Crowder would have seen and been aware of the disclosures. Furthermore, had she known of the Fuel System Defect, Plaintiff Frank-Crowder would not have purchased her vehicle or would not have purchased her vehicle for the price she did.

31. At all times, Plaintiff Frank-Crowder properly maintained her vehicle.

32. On or about May 9, 2024, after the check-engine light came on, Plaintiff Frank-Crowder took her vehicle to World Kia Joliet which performed the Voluntary Emission Service Campaign work on her vehicle. The technician updated the ECM and passed her gas tank. Within weeks of the campaign work being performed on her vehicle, the check engine light illuminated again.

CLASS ACTION COMPLAINT

33. On or about June 18, 2024, Plaintiff Frank-Crowder returned her vehicle to the dealership where the technician diagnosed the issue as being a faulty high pressure fuel pump. The dealership ordered the part but could not install it right away and told her she could continue to drive her vehicle as she waited for the part to come.

34. On or about June 24, 2024, Plaintiff Frank-Crowder returned her vehicle to the dealership when the check engine light illuminated again. At that time, the high-pressure fuel pump was replaced, along with a related gasket.

35. In July, the check engine light illuminated again as the engine was running roughly and shut off while Plaintiff Frank-Crowder was driving. The technician told her that she had used diesel fuel to fill her vehicle and that her fuel tank needed to be emptied and refueled even though Plaintiff Frank-Crowder fills up a gas station which only sells unleaded gasoline. She nevertheless paid for the repair. At the time of this visit, her vehicle had approximately 22,900 miles on the odometer.

36. Despite the foregoing, Plaintiff Frank-Crowder has not received a permanent repair under warranty, and her vehicle continues to exhibit the Fuel System Defect.

37. At all times, Plaintiff Frank-Crowder, like all Class Members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**Defendant Hyundai Motor America, Inc.**

38. Defendant Hyundai Motor America, Inc. is a corporation organized and in existence under the laws of the State of California and registered to do business in the State of California. HMA is headquartered in Fountain Valley, California and is a wholly owned subsidiary of HMC.

39. HMA is responsible for sales, marketing, service, distribution, import and export of Hyundai branded products, including vehicles and parts, in the United States. HMA is also the warrantor and distributor of Hyundai vehicles, including the Class Vehicles, throughout the United States.

40. In order to sell vehicles to the general public, HMA enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiffs. In return

CLASS ACTION COMPLAINT

for the exclusive right to sell new Hyundai branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties HMA provides directly to consumers who purchased new vehicles from the authorized dealerships. All service and repair at an authorized dealership is completed according to Hyundai instructions, issued through service manuals, TSBs, and other documents. Per the agreements between HMA and the authorized dealers, consumers such Plaintiffs can receive services under HMA's issued warranty at dealer locations that are convenient to them. These agreements provide HMA with a significant amount of control over the actions of the authorized dealerships. For example, HMA employees are appointed as managers for particular regions of the United States and their responsibilities include managing the day-to-day operations of the dealerships located within their regions.[1]

41.    Discovery will show that HMA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional material relating to the Hyundai Class Vehicles.

**Defendant Hyundai Motor Company**

42.    Defendant Hyundai Motor Company is a corporation founded in 1967 under the laws of South Korea and headquartered in Seoul, South Korea.

43.    HMC designs, engineers, manufactures, tests, markets, supplies, sells, and distributes Hyundai-branded vehicles and parts for those vehicles worldwide, including the United States, as well as manufactures parts for Kia-branded vehicles. HMC also receives parts manufactured by KMC for use in Hyundai-branded vehicles.

44.    HMC is the parent corporation of HMA, as well as the United States based Hyundai facilities, including manufacturing plants in Alabama and the technical campus in Michigan. For all its United States subsidiaries, including HMA, HMC provides all the technical information for the purposes of manufacturing, servicing, and repairing the Class Vehicles

---

[1] *See, e.g.*, https://www.hyundainews.com/en-us/releases/2135 (last accessed Nov. 12, 2024) ("Hyundai Motor America named Kimberly Walker General Manager of the Western Region, effective March 1, 2016. In her new role, Walker will lead the day-to-day operations of more than 165 Hyundai dealerships across the 12 Western-most states in the United States.").

CLASS ACTION COMPLAINT

45.    Discovery will show the decision to found HMA in California and register it as a California corporation was made by HMC.

65.    Discovery will show that the relationship between HMA and HMC is governed by an agreement that gives HMC the right to control nearly every aspect of HMA's operations— including sales, marketing, management policies, technical information, servicing instructions, governance policies, pricing, and warranty terms. Furthermore, HMC exercises control over the executives in charge of HMA, including appointing the President and CEO of HMA, José Muñoz. In addition to this role, Mr. Muñoz is also the Global Chief Operating Officer of HMC.[2]

**Defendant Kia Motors America, Inc.**

46.    Defendant Kia Motors America, Inc. is a corporation organized and in existence under the laws of the State of California and registered to do business in the State of California. KMA is headquartered in Irvine, California and is a wholly owned subsidiary of KMC.

47.    KMA is responsible for sales, marketing, service, distribution, import and export of Kia branded products, including vehicles and parts, in the United States. KMA is also the warrantor and distributor of Kia vehicles, including the Class Vehicles, throughout the United States.

48.    In order to sell vehicles to the general public, KMA enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new Kia branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties KMA provides directly to consumers who purchased new vehicles from the authorized dealerships. All service and repair at an authorized dealership is completed according to Kia instructions, issued through service manuals, TSBs and other documents. Per the agreements between KMA and the authorized dealers, consumers such as Plaintiffs can receive services under KMA's issued warranty at dealer locations that are convenient to them. These agreements provide KMA with a significant amount of control over the actions of the authorized dealerships. As with HMA, KMA also

_____

[2] *See* https://www.hyundainews.com/en-us/bios/jose-munoz (last accessed Nov. 12, 2024).

CLASS ACTION COMPLAINT

employs regional managers whose responsibilities include managing the dealers within their region, including marketing and customer satisfaction initiatives.

49. Discovery will show that KMA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional material relating to the Kia Class Vehicles.

**Defendant Kia Motor Company**

50. Defendant Kia Motor Company is a corporation founded in 1944 under the laws of South Korea and headquartered in Seoul, South Korea.

51. KMC designs, engineers, manufactures, tests, markets, supplies, sells, and distributes Kia-branded vehicles and parts for those vehicles worldwide, including the United States. One of KMC's major suppliers for parts is HMC. In turn, KMC is also a major supplier to HMC of parts to be used Hyundai-branded vehicles.

52. KMC is the parent corporation of KMA, as well as the United States based Kia facilities, including manufacturing plants in Georgia. For all its United States subsidiaries, including KMA, KMC provides all the technical information for the purposes of manufacturing, servicing, and repairing the Class Vehicles.

53. Discovery will show that the decision to found KMA in California and register it as a California corporation was made by KMC.

54. Discovery will show that the relationship between KMA and KMC is governed by an agreement that gives KMC the right to control nearly every aspect of KMA's operations— including sales, marketing, management policies, technical information, servicing instructions, governance policies, pricing, and warranty terms.

55. Defendants, through their various entities, design, manufacture, market, distribute, service, repair, sell, and lease passenger vehicles, including the Class Vehicles, nationwide, including California, Illinois and Oregon.

56. Defendants HMC and KMC worked together to develop, design, manufacture, test, and draft technical materials for the Class Vehicles and the Gamma II engines. In fact, HMC and KMC are controlled by the same parent, Hyundai Motor Group, and the chairman of

CLASS ACTION COMPLAINT

the board of both companies is Eui-sun Chung.

57.    Defendants worked together on the drafting of and distribution to authorized dealers of all advertising materials and technical bulletins regarding the Class Vehicles to authorized dealers, as well as on training Hyundai and Kia-dealer technicians in the correct procedures to maintain, service, and repair Hyundai and Kia vehicles.

58.    At all relevant times, Defendants were and are engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in California and Illinois, and throughout the United States of America.

## JURISDICTION

59.    This is a class action.

60.    Members of the proposed Class number more than 100 and at least one plaintiff and one defendant are citizens of different states.

61.    There are at least 100 members in the proposed class, and the aggregate claims of individual Class Members exceed $5,000,000.00 in value, exclusive of interest and costs.

62.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(d).

63.    This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 28 U.S.C. § 1367(a).

64.    This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to this Court's jurisdiction. This Court has personal jurisdiction over Defendants because KMA and HMA are incorporated in this District; KMC and HMC conduct substantial business in this District through KMA and HMA, respectively; and discovery will show that significant conduct involving Defendants giving rise to the Complaint took place in this District.

## VENUE

65.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the conduct giving rise to this lawsuit occurred here, KMA and HMA are deemed to reside in this district pursuant to 28 U.S.C. § 1391(a), and KMA and HMA are incorporated here, and Defendants subjected themselves to personal jurisdiction here by conducting business within the State of

California.

## FACTUAL ALLEGATIONS

66.     Defendants designed, manufactured, distributed, marketed, sold, and/or leased the Class Vehicles. Defendants sold, directly or indirectly, through dealers and other retail outlets, thousands of Class Vehicles in California and nationwide. Defendants warrant and service the Class Vehicles through their nationwide network of authorized dealers and service providers.

67.     Defendants provided all purchasers and lessees of the Class Vehicles with a New Vehicle Limited Warranty ("NVLW") and an Emissions Warranty ("EW"). The terms of these warranties are non-negotiable, and Defendants exercise sole authority in determining whether and to what extent a particular repair is covered under the warranties they offer.

68.     The NVLW provided by KMA includes basic warranty coverage and Power Train coverage, stated in relevant part as follows:

**5-year/60,000-mile New Vehicle Limited Warranty**

Kia's 5-year/60,000-mile New Vehicle Limited Warranty covers most vehicle components and systems for 60 months/60,000 miles from the Date of First Service, whichever comes first. It applies to factory defects and covers most repairs and replacements due to workmanship or material defects.

**10-year/100,000-mile Powertrain Limited Warranty**

Kia's 10-year/100,000-mile Powertrain Limited Warranty offers industry-leading coverage to protect your vehicle's essential components. The Powertrain Limited Warranty is applicable to the original purchaser and purchaser of a Certified Pre-Owned Kia, and begins upon the expiration of the 5-year/60,000-mile Basic Limited Warranty, covering your Kia up to 10 years or 100,000 miles from the date of first service, whichever comes first. It applies to essential components of the engine, transmission, axles, differentials, and propeller shafts, including internal parts, seals, gaskets, and key

CLASS ACTION COMPLAINT

assemblies.[3]

69.    KMA further warrants that "it will arrange for an Authorized Kia dealer at locations of its choice to provide for the repair of your vehicle if it fails to function properly during normal use. Authorized service facilities will remedy such failures to function properly at Kia's expense..."[4]

70.    HMA provides a similar NVLW for the Class Vehicles, which states in relevant part:

**HYUNDAI SUMMARY OF WARRANTY COVERAGE**

New Vehicle          5 years/60,000 miles

Powertrain          Original Owner 10 Years/100,000 Miles, Subsequent Owner(s) 5 Years/60,000 Miles

Emissions – Federal Specific Components   8 years/80,000 miles

**WHAT IS COVERED**

Repair or replacement of any component originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama (HMMA), Kia Manufacturing Mexico (KMM), Kia Motors Manufacturing Georgia (KMMG) or Hyundai Motor America (HMA) that is found to be defective in material or workmanship under normal use and maintenance, expect any item specifically referred to in the section "What is Not Covered."  Towing expense to the nearest Hyundai Dealership or Authorized Service Facility is covered when the vehicle is inoperable due to a warrantable defect. Repairs will be made using new Hyundai Genuine Parts or Hyundai authorized remanufactured parts.

**WARRANTY PERIOD**

The warranty period is limited to 5 years from the date of original retail delivery or date

---

[3] Warranty Information, https://www.kia.com/us/en/warranty (last accessed Nov. 12, 2024).

[4] *Id.*

of first use, or 60,000 miles, whichever occurs first.

**OBTAINING WARRANTY SERVICE**

Warranty service will be provided by an authorized Hyundai Dealership without charge for parts or labor. This warranty will not apply to warranty service performed by those other than an authorized Hyundai Dealership.[5]

71.    Both KMA and HMA provide an Emissions Warranty ("EW") as well. In accordance with the Federal Clean Air Act, they warranted to the original and each subsequent owner of each new vehicle that the vehicle's Engine Control Module, Catalytic Converter, and Onboard Emission Diagnostic Device ("OBD-II") would be designed, built and equipped to conform at the time of sale to applicable federal regulations and free from defects in material and workmanship at the time of sale that would cause the vehicle to fail to conform with such regulations for 8 Years/80,000 Miles.

72.    Under its NVLW, KMA and HMA provide, in fact, a 5-year or 60,000-mile warranty for all emission related components, including the fuel system, the fuel metering system, the air induction system, and the evaporative emissions control system, including the purge control valve, the fuel tank, and the fuel tank pressure sensor.

73.    As demonstrated by federal laws covering the emissions warranties, the emissions system on any vehicle is critical to the safe and reliable functioning of the vehicle, including the evaporative emission control system used by the fuel system to capture gasoline fumes before they leak out of the vehicle and pollute the air.

74.    The fuel system itself on any vehicle is also critical to the ability of the vehicle to provide transportation at all. For an internal combustion engine to produce power, fuel needs to be delivered to the combustion chamber where it is mixed with air and ignited to provide power which turns the crankshaft and provides power to the wheels and other systems, including the power steering and power brakes.

---

[5] https://www.hyundaiusa.com/content/dam/hyundai/us/com/pdf/assurance/2020_Owners_Handbook_Warranty_r2.pdf (last accessed Nov. 12, 2024).

75. To provide fuel to an engine, the fuel system both stores fuel in a tank and supplies fuel via a system of filters, pumps, fuel lines, and injectors.

76. Because of the critical nature of the fuel system, including the EVAP system, it is monitored at various points by the ECM via sensors. The ECM not only directs various parts of the fuel system to activate or deactivate, it is also specifically programmed to signal to the driver via the check engine light when one of the sensors detects issues with the fuel system and EVAP system, due to their importance.

77. The EVAP system gathers up the gas vapors, which are produced by the gasoline in the tank (regardless of whether the engine is running), via vent lines. These lines pass the fumes to the vapor storage canister, or charcoal canister, for confinement. When the vehicle starts, and while it is running, the canister releases the fumes; specifically, the ECM activates the associated purge valve, allowing the fumes to travel into the intake manifold. From there, the fumes are mixed with air and liquid fuel as they are introduced into the combustion chamber and ignited.

78. Figure 1 below is a generic schematic of a fuel system in a vehicle.



CLASS ACTION COMPLAINT

FIGURE 1

79.     At various points, there are sensors to monitor the air and vapor flow from the canister to the engine, as well as to ensure that there are no leaks by monitoring the pressure in the system. Due to the importance of this system functioning properly, the ECM must be programmed to detect leaks that are smaller than a pinprick, as well as other minute changes in the system. When the ECM detects one of these problems, it supposed to set a Diagnostic Trouble Code ("DTC"), which then alerts the driver about a problem in the vehicle via an illuminated check engine light on the dashboard.

80.     There are many DTCs which can be set which relate to problems detected in the EVAP system. A non-exhaustive list of such codes includes:

- P0441 Incorrect Purge Flow
- P0451 Evaporative Emission System Pressure Sensor/Switch
- P0452 Evaporative Emission System Pressure Sensor Low Input.
- P0453 Evaporative Emission System Pressure Sensor High Input
- P0454 Evaporative Emission System Pressure Sensor/Switch Intermittent
- P0455 Evaporative Emission System Leak Detected (Gross Leak / No Flow)
- P0456 Evaporative Emission System Leak Detected (Small)
- P1440 Purge Valve Stuck Open
- P1450 Unable to Bleed Up Fuel Tank Vacuum
- P1451 Evaporative Emission System Vent Control Valve Circuit

CLASS ACTION COMPLAINT

81.     In the Class Vehicles, the purge control solenoid valve ("PCSV"), also known as the purge control valve or purge valve, is an electronically operated valve activated by the ECM which is located close to the intake manifold on the engine. When the engine is off, the valve is closed. When the engine is on, the valve is turned on and off by the ECM at specific intervals to allow measured amounts of fumes from the canister to enter the intake manifold. The proper functioning of this valve is also monitored by the ECM. Figure 2 shows a generic schematic of how the PCSV fits into the fuel system.



FIGURE 2

82.     As these are critical systems, they must be designed, manufactured, assembled and installed with the upmost care. Failure of these systems can cause serious safety concerns, including: increased emissions of pollutants, gas leaks, poor engine performance, misfires, rough idling, a lack of motive power, a fuel cap that is hard to remove, a noticeable fuel odor in the interior compartment, difficulty in filling the fuel tank, and an expansion or distortion of the shape of the fuel tank due to a buildup of gases which also may result in sudden and loud popping noises and dislodging of the rear seats. In their most severe form, if the problem is allowed to continue for long enough, the fuel tank could explode, causing a fire or damage to

CLASS ACTION COMPLAINT

other components of the vehicle, including the backseat where passengers may be seated, or the frame, making the vehicle unfixable.

83.    These are the symptoms of the Fuel System Defect. Most concerning, the ECM which is supposed to scan for issues with the fuel system and set DTCs, thus warning the driver with a check engine light illuminating on the dashboard, malfunctions and does not provide the intended warning. As such, Plaintiffs and other Class Members first become aware of the Defect in their vehicles when its symptoms had already progressed beyond simple repairs.

84.    Despite the extreme importance of the fuel system, including the EVAP system and the ECM, it is so fundamental to the function of a vehicle that it is rarely discussed by manufacturers, including HMA and KMA, in their marketing. The fuel system is so inherent to the functioning of the vehicle and so fundamental that all consumers assume that a vehicle sold by a reputable dealership and manufactured by a reputable manufacturer will have the ability to safely carry fuel, deliver fuel to the engine, and properly direct emissions in compliance with federal and state laws.

85.    As such, Defendants do not advertise or discuss the fuel system in their marketing materials, except in reference to miles per gallon estimates and fuel tank capacity. Defendants do include some information on the Moroney Stickers of the Class Vehicles, including specifying the engine ("1.6L Turbo 4-Cylinder Engine") and the Environmental Protection Agency and Department of Transportation fuel economy miles per gallon estimates, greenhouse gas rating, and smog rating. These numbers would all be materially impacted by the Fuel System Defect, particularly the greenhouse gas rating and smog rating. However, Defendants make no mention of the Fuel System Defect or its serious associated safety risk anywhere on this label. They do, however, list "safety features," include the proprietary autonomous braking systems and cameras.

86.    Discovery will show that all Class Vehicles' fuel systems, including the EVAP system components, are designed, manufactured, assembled and installed by Defendants in substantially the same manner and use identical or substantially similar components. The Defect was inherent in all Class Vehicles and made the Class Vehicles defective from the moment they

CLASS ACTION COMPLAINT

left the possession of Defendants.

87.     Discovery will show that the Fuel System Defect is caused by improperly designed, manufactured, assembled and/or installed fuel system components in the Class Vehicles including: 1) improperly designed, manufactured, assembled or installed EVAP system valves, including the PCSVs, which permit pressurized air to flow into the fuel tank and otherwise degrade and fail before their useful life; 2) improperly manufactured or programmed ECMs, which failed to properly control various fuel system components or set diagnostic trouble codes which would have alerted the driver to problems prior to the vehicle sustaining irreparable damage; and/or 3) improper or inadequate material used to construct the fuel tank.

88.     Discovery will show that Defendants were aware of material facts regarding the Fuel System Defect, particularly because of pre-production testing, issues with prior models having similar fuel system component malfunctions and the resulting investigations, manufacturing quality control audits, and the early post-sale complaints by consumers who purchased the Class Vehicles and experienced the Defect. Despite this knowledge, Defendants failed to disclose the Defect and its associated safety risk to consumers. As a result of this failure, Plaintiffs and Class Members have been damaged.

**The Defect Poses an Unreasonable Safety Hazard**

89.     The Fuel System Defect poses an unreasonable safety hazard. The Defect causes drivers to experience engine misfires and lose power while driving, and it makes it hard to control the vehicle, which in turn increases the likelihood of collision with pedestrians, animals, inanimate objects, and road hazards. Further, the Fuel System Defect may result in sudden and loud popping noises and dislodging of the rear seats without warning and while occupied. Sudden fires and explosions may also result.

90.     Federal law requires automakers like Defendants to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

CLASS ACTION COMPLAINT

91.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related. *Id.* Discovery will show that HMA and KMA are the agents of HMC and KMC respectively for the purpose of monitoring the NHTSA complaint database and for communication with NHTSA regarding safety defects, as manufacturers are required to do by federal law. Thus, Defendants knew or should have known of the many complaints about the Fuel System Defect logged by NHTSA Office of Defects Investigation (ODI). The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Defendants to the Fuel System Defect.

92.     With respect solely to the Class Vehicles, **Exhibit 1** contains a sampling of the complaints concerning the Fuel System Defect which are available through NHTSA's website, www.safercar.gov. Many of the complaints reveal that Defendants, through their network of dealers and repair technicians, were made aware of the Fuel System Defect. In addition, the complaints indicate that despite having knowledge of the Fuel System Defect and even armed with knowledge of the exact vehicles affected, Defendants often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty. Drivers frequently report Defendants told them that remedies did not exist or otherwise refused to address their complaints.

### Customer Complaints on Third-Party Websites

93.     Similarly, complaints posted by consumers in internet forums demonstrate that the Defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate Defendants' awareness of the problems with the Fuel System Defect and how potentially dangerous the defect is for consumers, not only to the extent such complaints reference contact with authorized dealerships and Defendants themselves, but also because HMA and KMA employ staff to monitor the perception of their brands. **Exhibit 2** contains a sampling of consumer complaints (spelling and grammar mistakes remain as found

in the originals) regarding symptoms of the Defect, including trouble fueling, gas tank swelling, and others.

**Defendants Had Superior and Exclusive Knowledge of the Fuel System Defect**

94. Defendants had superior and exclusive knowledge of the Fuel System Defect and knew or should have known that the Defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

95. Discovery will show that before Plaintiffs purchased their Class Vehicle, and since at least 2019, Defendants knew about the Fuel System Defect through sources not available to consumers, including pre-release testing data, early consumer complaints to Defendants and its dealers who are their agents for vehicle repairs, consumer complaints regarding earlier model years equipped with the same engine, testing conducted in response to those complaints, high failure rates and replacement part sales data, consumer complaints to NHTSA (which Defendants monitor), by developing a consumer satisfaction campaign in an effort to address the Fuel System Defect, and through other aggregate data from Defendants' dealers about the problem. TSBs are issued exclusively to Defendants' dealerships and service providers and are not disseminated to consumers, even if their vehicles receive services as outlined in the bulletins.

96. Defendants are experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Defendants conducts tests, including pre-sale durability testing, on incoming components, including the Gamma II engines and their emissions systems, to verify the parts are free from defect and align with Defendants' specifications. Thus, Defendants knew or should have known the fuel system was defective and prone to putting drivers in a dangerous position due to the inherent risks of the Fuel System Defect.

97. Discovery will also show that Hyundai and Kia also became aware of the Fuel System Defect during the pre-production testing of various Class Vehicles. Like all manufacturers, Hyundai and Kia employ extensive pre-production testing protocols to evaluate the quality of the vehicles produced and to verify that the vehicles are made to specification. Hyundai and Kia maintain a shared proving ground in California City, California, which

CLASS ACTION COMPLAINT

includes a 6.4-mile oval track, a vehicle dynamics area, a vehicle handling course, a paved hill road, and other surface roads specially designed to mimic driving conditions in North America. The facilities also include a 30,000 square foot office complex which contains a substantial indoor testing area.[6] Discovery will show that Defendants had superior knowledge of the Fuel System Defects from testing at this and other proving ground facilities, including those in Korea, as well as from industry-standard quality control audits.

98.    Hyundai and Kia also have robust quality control mechanisms at their manufacturing facilities to help detect defects. For example, a previous recall of 2021-2022 Hyundai Sonata and Kia K5 vehicles began with the discovery at the Hyundai Motor Manufacturing Alabama and Kia Georgia facilities during post-assembly inspection that the high-pressure fuel pump and fuel rail line were improperly installed and, subsequently, that the supplier of a fuel pump had provided components which did not meet specifications. This led to a recall of 40,000 vehicles, produced over nearly a year's span. Because of Defendants' inspection procedures, they necessarily would have or should have also discovered the Fuel System Defect in Class Vehicles as well in post-assembly inspections.

99.    Additionally, discovery will show that Defendants knew of the impact of this Defect from the sheer number of reports received from dealerships. Defendants' customer relations departments, which interact with individual dealerships to identify potential common defects, received numerous reports regarding the Defect, which led to the release of a customer service campaign and dealer communications. Defendants' customer relations departments also collect and analyze field data including, but not limited to, repair requests made at dealerships, technical reports prepared by engineers who have reviewed vehicles for which warranty coverage is being requested, parts sales reports, and warranty claims data.

100.    Defendants' warranty departments similarly analyze and collect data submitted by their dealerships to identify warranty trends in their vehicles. It is Defendants' policy that

---

[6] *See* "Hyundai Proving Grounds – California City, California," https://www.hyundainews.com/en-us/releases/1251 (last accessed Nov. 12, 2024); *see also* https://www.youtube.com/watch?v=gnwjx1XGCB0 (last accessed Nov. 12, 2024) (video of blogger who was flown to the California Proving Ground by Kia to via preproduction testing).

when a repair is made under warranty the dealership must provide Defendants with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Defendants, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

101.    Well before the first Class Vehicle was sold, as early as June 2019, Defendants knew or should have known that the fuel systems were defective in design, manufacture and/or workmanship and that the Defect would adversely affect the drivability of the Class Vehicles and cause safety hazards, including collisions.

102.    Indeed, in 2018, various Kia customers who had vehicles with a 1.6L Gamma engine experienced purge solenoid valve failures. One customer described his experience in which the dealership technician acknowledged this was a well-known, common occurrence and that the part was defective.[7]



103.    Moreover, as described by some customers, the ECM was not necessarily detecting the faults:[8]

---

[7]   https://www.kia-forums.com/threads/code-p0455-evaporative-emission-system-leak.329954 (last accessed Nov. 12, 2024).

[8] *Id.*

**ron1004**
13118 posts · Joined 2005

#10 · Sep 24, 2021

If the fault with the purge valve is intermittent, then the CEL wont be ON - if you clear the codes and check again later and find an evap code then you'll know if the valve is bad.

Just saying the valve coil resistance check could confirm a totally dead one, but if the resistance reading is good, you could still have a bad valve.

104.    At the same time, Kia and Hyundai were beginning to receive more reports of failures in the fuel system of the Class Vehicles. These early reports include drivers smelling fuel in their vehicles, such as the NHTSA complaint in 2022 regarding a 2021 Hyundai Sonata, and a driver's difficulty in fueling his new 2021 Kia K5 in July 2021. *See* **Exhibit 1, p. 17**.

105.    In April 2024, media reports of numerous Class Vehicles suffering from expanded or deformed gas tanks were alarming consumers.[9] On April 29, 2024, Kia suddenly announced a Voluntary Emissions Service campaign for 2021-2024 Kia K5 vehicles.

106.    This voluntary campaign issued certain public documents to consumers and Class Members, including **Exhibit 3**, a Frequently Asked Questions document which fails to mention *any* associated safety risk. Kia characterized the Fuel System Defect as exclusively an emissions issue rather than a safety issue or a safety and emissions issue.

107.    This voluntary campaign, conducted outside the oversight of NHTSA, only updates the programming of the ECM for most of the over 200,000 Kia Class Vehicles (but not Hyundai Class Vehicles) covered by the campaign, despite the fact that Kia is clearly aware of a significant issue with the PCSV.  In particular, Kia directs dealers to scan the Electronic Control Unit ("ECU"), a/k/a ECM, for DTC P0451. Unless this DTC is found, dealerships are directed to only update the ECU.

108.    If DTC P0451 is stored, then the dealership technician inspects the fuel tank band and potentially replaces the PCSV. If the fuel tank band is found to be "not good," then the

---

[9]   *See*   https://www.wsoctv.com/news/local/kia-acknowledges-gas-tanks-swelling-suddenly-offers-free-fix/2XP6TP7RY5F6DIYMAENMTSRPXA   (last accessed Nov. 12, 2024).

CLASS ACTION COMPLAINT

dealer inspects the fuel pump cover and potentially replaces the fuel tank. If the fuel pump cover is also "not good," then the dealer is directed to open a case with KMA's Techline Repair Assistance. The voluntary service campaign associated with TSB (SC288) released to dealerships describing this remedy noted, upon initial publication, that parts were not yet available. No subsequent version of the TSB acknowledges the truth: vehicles with bad fuel tank bands and fuel pump covers are essentially unrepairable.

109.    On or about December 21, 2024, HMA issued a Service Campaign for "certain 2020-2023 Hyundai Sonata vehicles," a full seven months after Kia's. The Hyundai campaign states that the California Air Resources Board has determined these vehicles "may be releasing air pollutants which exceed Federal and California standards." Like the Kia campaign, the Hyundai campaign adviseded drivers to bring their vehicles into a Hyundai dealership to have the ECU/ECM updated, and if necessary, "replace the check valve and/or fuel tank."  Like the Kia service campaign, this service campaign does not describe the defect in detail, nor its safety risks, and does not actually provide a proper repair for the Defect.

110.    Discovery will show that each official communication, product voluntary campaign, and service action issued by Defendants was approved by managers, directors, and/or executives at Kia and Hyundai. Therefore, discovery will show that Defendants' managers, directors, and/or executives knew, or should have known, about the Fuel System Defect, but refused to disclose the Fuel System Defect to prospective purchasers and owners, and/or actively concealed the Fuel System Defect. Even after issuance of the service campaigns, Defendants failed to inform existing owners of the safety risks of the Defect and failed to disclose the Defect at all to new buyers of the Vehicles.

111.    The existence of the Fuel System Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Fuel System Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

112.    Reasonable consumers, like Plaintiffs, expect that a vehicle's fuel systems are safe, will function in a manner that will not pose a safety risk, will not malfunction such that

CLASS ACTION COMPLAINT

they destroy the vehicle, and are free from defects. Plaintiffs and Class Members further reasonably expect that Defendants will not sell or lease vehicles with known safety defects, such as the Fuel System Defect, and will disclose any such defects to its consumers when they learn of them. They did not expect Defendants to conceal and fail to disclose the Fuel System Defect to them or deny the Defect as Defendants did for an extended period of time, or to minimize the Defect and try to deny as many repairs under their voluntary campaigns as possible, as Defendants now do.

**Defendants Have Actively Concealed the Fuel System Defect**

113.    Despite their knowledge of the Fuel System Defect in the Class Vehicles, Defendants actively concealed the existence and nature of the defect from Plaintiffs and Class Members. Specifically, Defendants failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

(a)    any and all known material defects or material nonconformity of the Class Vehicles, including the defects pertaining to the fuel system, including the EVAP system and the ECM;

(b)    that the Class Vehicles, including their fuel systems, were not in good working order, were defective, and were not fit for their intended purposes; and

(c)    that the Class Vehicles and their fuel systems were defective, even though Defendants learned of such defects as early as 2021, if not earlier.

114.    Discovery will show that when consumers present their Class Vehicles to an authorized Defendants' dealer for fuel system repairs, rather than repair the problem under warranty, Defendants' dealers either inform consumers that their vehicles are functioning properly, claim the vehicles have been in an unreported accident, like Plaintiff Masters, claim the vehicles have been fueled improperly, like Plaintiff Frank-Crowder, or conduct repairs that merely mask the Fuel System Defect such as updating the ECM without replacing any known defective parts, as experienced by Plaintiff Frank-Crowder.

115.    Defendants have caused Plaintiffs and Class Members to expend money and/or time at their dealerships to diagnose, repair or replace the Class Vehicles' fuel systems and/or

CLASS ACTION COMPLAINT

related components, despite Defendants' knowledge of the Fuel System Defect.

**Defendants Have Unjustly Retained a Substantial Benefit**

116.    Discovery will show that Defendants unlawfully failed to disclose the alleged defect to induce Plaintiffs and other putative Class Members to purchase or lease the Class Vehicles.

117.    Plaintiffs further allege that Defendants thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs' transactions.

118.    As discussed above, therefore, Plaintiffs allege that Defendants unlawfully induced them to purchase their Class Vehicle by concealing a material fact (the defective fuel systems) and that they would have paid less for their Class Vehicle, or not purchased it at all, had they known of the defect.

119.    Accordingly, Defendants' ill-gotten gains—benefits accrued in the form of increased sales and profits resulting from the material omissions that did, and likely will continue to, deceive consumers—should be disgorged.

**The Agency Relationship Regarding the Vehicle Warranties Between Defendants HMA and KMA and their Authorized Dealers**

120.    To sell vehicles to the general public, Defendants HMA and KMA enter into agreements with their networks of authorized dealerships to engage in retail sales with consumers such as Plaintiffs while also advertising the warranties provided by HMA and KMA directly to consumers when they purchase a Kia or Hyundai-branded vehicle from the authorized dealership. These agreements specifically authorize the dealerships to act in HMA and KMA's stead to provide repairs under the warranties HMA and KMA provide directly to consumers. Accordingly, as discovery will show, particularly the dealership agreements between Defendant HMA and KMA and third-party dealerships, Defendants HMA and KMA have authorized these dealerships to be their agents for the purposes of warranty repairs, including diagnosis of whether warranty repairs are required, and as such, the consumers are third-party beneficiaries of these

dealership agreements because they benefit from being able to purchase and receive warranty repairs locally. Discovery will show that because Plaintiffs and members of the Class are third-party beneficiaries of the dealership agreement which create an implied warranty of merchantability of the goods being sold by these authorized dealerships, they may avail themselves of the implied warranty against Defendants. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

121. Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of the express and implied warranties which accompany each Class Vehicle. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by HMA or KMA. These warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of the express and implied warranties, and the consumers may therefore avail themselves of those warranties.

122. HMA and KMA issued express warranties to Plaintiffs and the Class members. HMA and KMA also developed and disseminated the owner's manuals and warranty booklets which direct consumers to take their vehicles to authorized dealerships for diagnosis and repair. HMA and KMA also developed and disseminated the advertisements such as vehicle brochures and television commercials, and other promotional materials relating to the Class Vehicles and promoting the terms of the warranties that they issue with the sale of each Class Vehicle. HMA and KMA are also responsible for the content of the Monroney Stickers on their vehicles. Because they issue the express warranties directly to the consumers, the consumers are in direct privity with HMA and KMA with respect to the warranties.

123. In promoting, selling, and repairing their defective vehicles, Defendants act through numerous authorized dealers who act as, and represent themselves to the public as, exclusive Kia and Hyundai representatives and agents, particularly for the purpose of providing

repairs that are the responsibility of HMA and KMA to provide under their respective warranties. That the dealers act as Defendants' agents for this purpose is demonstrated by the following facts:

(a)    The authorized dealerships complete all service and repair according to instructions disseminated directly to them by HMA and/or KMA, including service manuals, technical service bulletins ("TSBs"), technical tips ("TT"), and other documents drafted by HMC and/or KMC;

(b)    Technicians at Defendants dealerships are required to go to at least yearly KMA and HMA-given trainings in order to remain certified to work on Kia and Hyundai-branded vehicles, at which they receive training on proprietary systems, which provides guided, step-by-step instructions on diagnosing and repairing Kia and Hyundai-branded vehicles;

(c)    Consumers can receive services under Kia and Hyundai's issued New Vehicle Limited Warranties only at authorized dealerships, and they are able to receive these services because of the agreements between HMA and KMA and the authorized dealers. These agreements provide HMA and/or KMA with a significant amount of control over the actions of the authorized dealerships;

(d)    The warranties provided by HMA and/or KMA for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

(e)    HMA and KMA control the way in which their authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform repairs under warranty only with HMA's or KMA's authorization;

(f)    HMA and KMA have entered into agreements and understandings with their authorized dealers pursuant to which they authorize and exercise substantial control over the operations of their dealers and the dealers' interaction with the public, particularly the advertising of the Class Vehicles, specifically the terms and conditions of the express warranties, as well as how consumers may avail themselves of the remedies under those express warranties; and

(g)  HMA and KMA implemented their express and implied warranties as they relate to the defects alleged herein by instructing authorized Kia and Hyundai dealerships to address complaints of the Defect and by prescribing and implementing the relevant TSBs cited herein.

124.  Indeed, HMA's and KMA's warranty booklets make it abundantly clear that only their authorized dealerships are their agents for warranty service. The booklets, which are plainly written for the consumers, not the dealerships, tell consumers that to obtain warranty service, "You must take your Kia Vehicle, along with this manual, to an Authorized Kia Dealer in the United States during its normal service hours.," (Kia Warranty); and "[w]arranty service will be provided by an authorized Hyundai Dealership without charge for parts or labor." (Hyundai Warranty).

125.  Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendants for the purposes of the warranties, which are direct contracts between HMA, KMA, and the purchasers of their branded vehicles. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either HMA, KMA, or their agent dealerships to establish privity of contract between HMA or KMA, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and Defendants. It also establishes that Plaintiffs were dealing with Defendants through their authorized agent dealerships when they were given the NVLW and EW associated with their vehicles, without any ability to negotiate the terms of those warranties.

**Defendants' Warranties were Unconscionable**

126.  Plaintiffs signed contracts for sale with Defendants' authorized dealers, and in connection with those sales, were presented with separate warranties drafted and provided by KMA and/or HMA. While Plaintiffs had some ability to negotiate the prices of their vehicles, they had no ability to negotiate the terms of the warranties. Plaintiffs had no bargaining power with respect to the warranties, were presented with them as a *fait accompli*, and had to accept them in the exact form in which they were presented, which occurred after the vehicle purchase

CLASS ACTION COMPLAINT

transactions were completed. Plaintiffs had no meaningful choice regarding any aspect of the warranties or their terms, including durational limitations of time and mileage. The terms of the warranties unreasonably favored HMA or KMA over Plaintiffs and the members of the Class; a gross disparity in bargaining power existed as between HMA and KMA and Class members; and HMA and KMA knew or should have known that the Fuel System Defect would manifest in the Class Vehicles both before and after the warranties expired, thereby rendering the time and mileage limitations insufficient, inadequate, and unconscionable.

127. HMA and KMA drafted the terms of the warranties in part by using their exclusive, superior knowledge of the existence and likely manifestation of the Defect. Plaintiffs and Class Members were entirely ignorant of the Defect when purchasing their Vehicles and when presented with the warranties. Plaintiffs' acceptance of the warranties and their terms, including any disclaimers or durational limits, was neither knowing nor voluntary. HMA and KMA knew or should have known at the time of sale that the Class Vehicles were defective and would fail prematurely solely because of a defect in design, materials, and workmanship, to wit, the Fuel System Defect. Plaintiffs and Class Members, on the other hand, had no notice of or ability to detect the Defect prior to purchasing the Class Vehicles. For this reason, the terms of the warranties unreasonably favored HMA and KMA over Plaintiffs and Class Members, and Plaintiffs' and Class Members' acceptances of the warranties' durational limitations, to the extent they are found to apply so as to exclude instances where the Defect manifested outside of them, were neither knowing nor voluntary, thereby rendering such limitations unconscionable and ineffective.

128. Defendants' exclusive superior knowledge of the existence of the Defect and when it would manifest influenced its analysis of the Defect and whether it should pay for a recall (*i.e.,* if a defect is more likely to manifest within the durational limits, a recall is only fractionally more expensive than warranty repairs; if it is more likely to manifest outside those limits, a recall is exponentially more expensive than warranty repairs.)

129. Plaintiffs were also not aware and could not have been aware that HMA and KMA would willfully not inform them of the Defect which affects the safety of their vehicles

CLASS ACTION COMPLAINT

and that the Defect could manifest outside of the durational limit of the warranties, despite Defendants' knowledge of this. *See Carlson v. Gen. Motors Corp.*, 883 F.2d 287 (4th Cir. 1989), cert. denied, 495 U.S. 904 (1990) (""proof that GM knew of and failed to disclose major, inherent product defects would obviously suggest that its imposition of the challenged 'durational limitations' on implied warranties constituted 'overreaching,' and that the disclaimers themselves were therefore 'unconscionable.'")

### Equitable Relief is Necessary

140.   Recourse to the equitable powers of the Court, and relief in equity, is necessary here to provide full and complete relief to Class Members.

141.   First, Plaintiffs, on behalf of themselves and the Class Members, seek equitable relief in this matter in the form of prospective injunctive relief.

142.   Plaintiffs seek an injunction requiring Defendants issue a prompt, complete, and effective repair of the Fuel System Defect and all related components unduly worn or damaged due to the Defect's presence. To date, no recall has ever been issued, even though as explained *supra*, Defendants has concluded that various fuel system components in the Class Vehicles have design and/or manufacturing defects.

143.   Additionally, Plaintiffs seek an injunction requiring Defendants to provide fulsome and comprehensive notice to each Class Member regarding the existence of the Fuel System Defect in their vehicles, Defendants' knowledge thereof, the attendant risks to vehicle componentry, the attendant safety concerns and risks, and the availability of any relief available. Moreover, Defendants should be compelled to provide notice to every current and former registered owner of the Class Vehicles.

144.   To that end, Plaintiffs seek an injunction requiring Defendants to acquire the contact information, including addresses for direct mail notice, associated with each Class Vehicle's VIN number, from the Departments of Motor Vehicles of the fifty states, which is done routinely in connection with class certification in automotive defect cases, and to send direct-mail notice containing the above-referenced disclosures to each Class Member, including current

owners or lessees, former owners and lessees, and former owners/lessees who disposed of their vehicles due to the existence of the Fuel System Defect.

145.    Unless restrained by this Court and supervised by putative Class Counsel, Defendants will not provide adequate relief to Class Members. Defendants will not acquire the addresses of all Class Members, including former and current owners/lessees, from the Departments of Motor Vehicles of the fifty states. Defendants will not send direct mail notice with complete disclosures regarding its knowledge of the Fuel System Defect, its effect on the vehicles' componentry, its attendant safety risks, the availability of a prompt, complete, and effective fix for the Fuel System Defect in all Class Vehicles and what components damaged by the Fuel System Defect's manifestation can be repaired.

146.    Plaintiffs further seek injunctive relief to require Defendants to modify its advertising for vehicles it is currently producing and distributing for sale with the same engines, to provide a complete disclosure of its knowledge of the Fuel System Defect, its effect on the vehicles' componentry, and its attendant safety risks.

147.    Plaintiffs further seek additional injunctive relief to require Defendants to provide reimbursement for all costs of repair and related costs, such as towing, rental, and other costs, and to require such reimbursement claims to be handled by an independent third-party administrator to ensure fairness.

148.    Plaintiffs also seek equitable relief in the form of restitution, credit-repair, and other compensation for Class Members, who, because of the high cost of repairing their vehicles after failure, sold or traded the vehicles in for less than fair market value, had the vehicle repossessed, or were forced to continue making payments on a non-functioning vehicle. Any repair which may now become available will do absolutely nothing to compensate Class Members who could not afford to repair their vehicles and therefore either sold or traded them in, had them repossessed or continued to make payments on non-functioning vehicles. The Court can and should exercise its discretion to award equitable relief to such Class Members.

149.    Additionally, many Class Members have been without the use of their vehicle for months, while they await repairs. Numerous Class Members who have experienced failures

have been told that parts are not available and therefore they have been without a functioning vehicle for weeks or months. The Court can and should exercise its discretion to afford equitable relief to such Class Members. Defendants should be required to provide repairs within a reasonable time, provide rental car reimbursement, and provide other relief that fairness requires.

150.    Legal remedies are inadequate to obtain the above-referenced outcomes, including fulsome and complete notice to all Class Members, including notice of the active and ongoing downstream mechanical effects of the unrepaired Fuel System Defect and notice of the Defect's safety risks. Nor are legal remedies adequate to compel Defendants to devise a prompt, complete, and effective fix that can be applied to each Class Vehicle. Nor are legal remedies equally as prompt, certain, and in other ways efficient to provide notice to the Class Members and a fulsome and prompt fix to their vehicles.

**TOLLING OF THE STATUTES OF LIMITATIONS**

130.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of the Fuel System Defect and misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiffs and members of the Class were deceived regarding the Class Vehicles and could not reasonably have discovered the Defect or Defendants' deception with respect to the Defect. Defendants and their agents continue to deny the existence and extent of the Defect, even when questioned by Plaintiffs and members of the Class.

131.    Plaintiffs and members of the Class did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendants were concealing a defect and/or that the Class Vehicles contained the Fuel System Defect and the corresponding safety risk. As alleged herein, the existence of the Fuel System Defect was material to Plaintiffs and members of the Class at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiffs and members of the Class could not have discovered through the exercise of reasonable diligence the existence of the Defect or that the Defendants were concealing the Defect.

132.    At all times, Defendants are and were under a continuous duty to disclose to Plaintiffs and members of the Class the true standard, quality, and grade of the Class Vehicles

and to disclose the Fuel System Defect and corresponding safety risk due to their exclusive and superior knowledge of the existence and extent of the Fuel System in Class Vehicles.

133.    Defendants knowingly, actively, and affirmatively concealed the facts alleged herein. Plaintiffs and members of the Class reasonably relied on Defendants' knowing, active, and affirmative concealment.

134.    For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendants' fraudulent concealment, and Defendants are estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

135.    Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

136.    The Class and Sub-Classes are defined as:

**Class**:    All persons and entities in the United States who purchased or leased a Class Vehicle (the "Nationwide Class" or "Class").

**California Sub-Class**:  All persons and entities who purchased or leased a Class Vehicle in the State of California.

**Illinois Sub-Class**:  All persons and entities who purchased or leased a Class Vehicle in the State of Illinois.

137.    Excluded from the Class and Sub-Classes are:  (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Classes should be expanded or otherwise modified.

CLASS ACTION COMPLAINT

138.     Numerosity:  Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Departments of Motor Vehicles.

139.     Typicality:  Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Defendants. The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that (1) they purchased Class Vehicles that they would not have purchased or paid more for the Class Vehicles than they would have paid had they known of the Defect, (2) they have incurred or will incur the cost of repairing the Fuel System Defect, and (3) their Class Vehicles are now worth less than they would be worth if they did not have the Defect. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread resulting in injury to all members of the Class.

140.     Commonality:  There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

(a)     Whether Class Vehicles suffer from defects relating to the fuel system;

(b)     Whether the defects relating to the fuel system constitute an unreasonable safety risk;

(c)     Whether Defendants knew about the Fuel System Defect and, if so, how long Defendants have known of the Defect;

(d)     Whether the defective nature of the fuel system, including the EVAP system, constitutes a material fact;

(e)     Whether Defendants have had an ongoing duty to disclose the defective nature of the fuel system to Plaintiffs and Class Members;

(f)     Whether Plaintiffs and the other Class Members are entitled to equitable

relief, including a preliminary and/or a permanent injunction;

(g)    Whether Defendants reasonably should have known of the defects pertaining to the fuel system before they sold and leased Class Vehicles to Class Members;

(h)    Whether Defendants should be declared financially responsible for notifying the Class Members of problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective fuel system and/or its components;

(i)    Whether Defendants are obligated to inform Class Members of their right to seek reimbursement for having paid to diagnose, repair, or replace their defective fuel system and/or its components;

(j)    Whether Defendants breached the Magnuson-Moss Warranty Act;

(k)    Whether Defendants breached the implied warranty of merchantability under California's Song-Beverly Act and Illinois laws;

(l)    Whether Defendants breached their express warranties under California's Song-BeverlyAct and Illinois laws; and

(m) Whether Defendants violated the consumer protection statutes of California, and Illinois.

141.    Adequate Representation:    Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to vigorously prosecute this action.

142.    Predominance and Superiority:  The common issues above predominate over any issues affecting only individual Class members in that the parties will spend the overwhelming majority of their time and effort litigating those common issues. Plaintiffs and Class Members have all suffered, and will continue to suffer, harm and damages because of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members

would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

**Claims on Behalf of the California Sub-Class**

**<u>FIRST CAUSE OF ACTION</u>**
**Violation of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200,** *et seq.*
**(On behalf of the California Sub-Class against HMA and HMC)**

143.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

144.    California Plaintiff brings this count on behalf of himself and the California Sub-Class against Defendants HMA and HMC ("Defendants" for the purposes of this cause of action).

145.    California Business & Professions Code § 17200 prohibits "unfair competition" including any "unlawful, unfair, or fraudulent business practice" and "unfair, deceptive, untrue or misleading advertising." Defendants engaged in conduct that violated each of this statute's three prongs.

146.    Defendants committed an unlawful business act or practice in violation of Cal. Bus. & Prof. Code § 17200, et seq., by systematically breaching its warranty obligations and by violating the MMWA and the Song-Beverly Consumer Warranty Act as alleged above and below.

147.    Defendants committed unfair business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., because the acts and practices described herein, including but not limited to Defendants' failure to provide a permanent remedy to fix the Fuel System Defect,

CLASS ACTION COMPLAINT

are immoral, unethical, oppressive, unscrupulous, unconscionable, and/or substantially injurious to California Plaintiff and California Sub-Class Members. Defendants' acts and practices were additionally unfair because the harm to California Plaintiff and California Sub-Class Members is substantial and is not outweighed by any countervailing benefits to consumers or competition. Further, Defendants' acts and practices were unfair in that they were contrary to legislatively declared or public policy.

148.    Defendants committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., when they concealed the existence and nature of the Defect, while representing in their marketing, advertising, and other broadly disseminated representations that the Class Vehicles were safe when, in fact, the Fuel System Defect creates a significant and material safety hazard that degrades the quality, functionality and safety of the Class Vehicles. Defendants' representations, omissions, and active concealments about the Defect are likely to mislead the public regarding the true defective nature of Class Vehicles.

149.    Defendants' unfair or deceptive acts or practices occurred repeatedly in the course of Defendants' trade or business and were likely to mislead a substantial portion of the purchasing public.

150.    California Plaintiff and the California Sub-class relied on Defendants' material representations and nondisclosures and would not have purchased/leased, or would have paid less for, the Class Vehicles had they known the truth.

151.    As a direct and proximate result of Defendants' unfair, unlawful, and deceptive practices, California Plaintiff and the California Sub-class have lost money.

152.    California Plaintiff would consider purchasing or leasing similar Defendant vehicles in the future if California Plaintiff could rely on Defendants' representations regarding the vehicles.

153.    California Plaintiff and California Subclass Members seek an order enjoining Defendants from committing such unlawful, unfair, and fraudulent business practices, and seek restitution pursuant to Cal. Bus. & Prof. Code § 17203.

CLASS ACTION COMPLAINT

**SECOND CAUSE OF ACTION**
**Breach of Express Warranty**
**Cal. Com. Code §§ 2313 and 10210**
**(On behalf of the California Sub-Class Against HMA)**

154.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

155.    California Plaintiff brings this cause of action individually and on behalf of the members of the California Sub-Class against HMA ("Defendant" for the purposes of this claim).

156.    Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

157.    With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

158.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

159.    Defendant provided all purchasers and lessees of the Class Vehicles with express warranties described herein, which became a material part of the bargain. Accordingly, Defendant's express warranties are  express warranties under California state law.

160.    In a section entitled "What is Covered," Defendant's NVLW provides in relevant part for "repair or replacement of any component originally manufactured or installed by Hyundai Motor Company, Hyundai Motor Group, Hyundai Motor Manufacturing Alabama (HMMA), Kia Manufacturing Mexico (KMM), Kia Motors Manufacturing Georgia (KMMG) or Hyundai Motor America (HMA) that is found to be defective in material or workmanship under normal use and maintenance."

161.    According to Defendant, the coverage is for 5 years or 60,000 miles, whichever comes first, if not longer. Defendant also provides an emissions component warranty for 8 years or 80,000 miles, whichever comes first.

162.    Defendant's bumper-to-bumper and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when California Plaintiff and members of the California Sub-Class purchased or leased the Class Vehicles with the defective fuel

CLASS ACTION COMPLAINT

system and/or related components.

163.    California Plaintiff and members of the California Sub-Class experienced defects within the warranty period. Despite the existence of the applicable warranties, Defendant failed to inform California Plaintiff and members of the California Sub-Class that the Class Vehicles were equipped with defective fuel systems, ECMs, and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

164.    Defendant breached the express warranties through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendants and then failing to do so. Defendants have not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

165.    Privity is not required here because California Plaintiff and members of the California Sub-Class are intended third-party beneficiaries of contracts between Defendant and its distributors and dealers, and the direct intended beneficiaries of Defendant's express warranties, and any warranties provided with certified pre-owned vehicles. Notably, Defendant issued the express warranties directly to California Plaintiff and the California Sub-Class and not to its subsidiaries or dealers. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

166.    Any attempt by Defendant to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because Defendant knowingly sold or leased defective products without informing consumers about the Fuel System Defect. The time limits are unconscionable and inadequate to protect California Plaintiff and the members of the California Sub-Class. Among other things, California Plaintiff and members of the California Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by Defendant and unreasonably favored

Defendant. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between Defendant and members of the California Sub-Class.

167. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make California Plaintiff and the members of the California Sub-Class whole, because Defendant has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

168. California Plaintiff was not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure its breach of written warranty would have been futile. Defendant was also on notice of the Fuel System Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

169. Nonetheless, California Plaintiff and members of the California Sub-Class provided notice to Defendant of the breach of express warranties when they took their vehicles to Defendant-authorized providers of warranty repairs. California Plaintiff also provided notice to Defendant of its breach of express warranty by letter dated August 23, 2024.

170. As a result of Defendant's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or loss of value of their Class Vehicles.

171. As a direct and proximate result of Defendant's breach of express warranties, California Plaintiff and members of the California Sub-Class have been damaged in an amount to be determined at trial.

172. As a result of Defendant's breach of the express warranties, California Plaintiff and California Sub-Class Members are entitled to legal and equitable relief against Defendant, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**THIRD CAUSE OF ACTION**
**Breach of Implied Warranty Act**
**Pursuant to Song-Beverly Consumer Warranty Act**
**Cal. Civ. Code §§ 1792 and 1791.1, *et seq.***
**(On behalf of the California Sub-Class against HMA and HMC)**

173.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

174.    California Plaintiff brings this cause of action on behalf of himself against Defendants HMA and HMC ("Defendants" for the purposes of this claim).

175.    Defendants are and were at all relevant times the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Defendants knew or had reason to know of the specific uses for which the Class Vehicles were purchased or leased.

176.    Defendants provided California Plaintiff and the California Sub-Class members with an implied warranty that the Class Vehicles and their components and parts were merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles suffered from an inherent defect in the fuel system at the time of sale (and thereafter) and thus were not fit for their particular purpose of providing safe and reliable transportation.

177.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their fuel systems, which were manufactured, supplied, distributed, and/or sold by Defendants, would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their fuel system would be fit for their intended use.

178.    Contrary to the applicable implied warranties, the Class Vehicles and their fuel system at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing California Plaintiff and the California Sub-Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including the defective fuel system.

179.    Contrary to the applicable implied warranties, the California Plaintiff's and the

CLASS ACTION COMPLAINT

California Sub-class's vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing the California Plaintiff and the California Sub-class with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including defective design, workmanship and materials.

180.    The Fuel System Defect is inherent and was present in each Class Vehicle at the time of sale.

181.    As a result of Defendants' breach of the applicable implied warranties, owners and/or lessees of the Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, California Plaintiff and the California Sub-Class members were harmed and suffered actual damages in that the Class Vehicles' fuel system and/or its components are substantially certain to fail before their expected useful life has run.

182.    Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

**Claims on Behalf of the Illinois Sub-Class**

**FOURTH CAUSE OF ACTION**
**Violations of the Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 Ill. Comp. Stat. § 505/1,** *et seq*
**(On Behalf of the Illinois Sub-Class against KMA and KMC)**

183.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

184.    Plaintiff Michelle Frank-Crowder ("Illinois Plaintiff") brings this count on behalf of herself and the Illinois Sub-Class against Defendants KMA and KMC ("Defendants" for purposes of this claim).

185.    Defendants are "persons" as defined in 815 Ill. Comp. Stat. § 505/1(c).

186.    Illinois Plaintiff and the Illinois Sub-Class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. § 505/1(e).

187.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois

CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 Ill. Comp. Stat. § 505/2. Defendants engaged in unlawful trade practices and unfair or deceptive acts or practices that violated the Illinois CFA.

188. Defendants participated in and engaged in deceptive business or trade practices prohibited by the Illinois CFA by failing to disclose and actively concealing that the Class Vehicles contained the Defect, by marketing their Class Vehicles as safe and of high quality, and by presenting themselves as reputable manufacturers that valued safety and stood behind their vehicles after they were sold.

189. Defendants knowingly and intentionally misrepresented and omitted material facts in connection with the sale and lease of the Class Vehicles by, among other things, failing to disclose the Defect; concealing the Defect; promoting and selling or leasing Class Vehicles they knew were defective, including by marketing their vehicles as safe, reliable, easily operable, efficient, and of high quality; presenting themselves as reputable manufacturers that valued safety, reliability, performance and efficiency, and stood behind their vehicles after they were sold; failing to make repairs or making repairs and providing replacements that caused Illinois Plaintiff and the Illinois Sub-Class Members to experience repeated instances of failure, rendering the warranties useless; and minimizing the scope and severity of the problems with the Class Vehicles, refusing to acknowledge that they are defective, and failing to provide adequate relief to consumers. Defendants misrepresented and omitted such material facts with the intent to mislead Illinois Plaintiff and the Illinois Sub-Class Members about the true nature of the Class Vehicles.

190. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and Defect in the course of their business.

191. Defendants also engaged in unlawful trade practices by employing deception,

CLASS ACTION COMPLAINT

deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of material facts with intent that Plaintiffs and Class members rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

192.    Defendants' unfair and deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

193.    Defendants knew that the Class Vehicles and their fuel systems suffered from an inherent defect, were defectively designed or manufactured, and were not suitable for their intended use.

194.    Defendants knew or should have known that their conduct violated the Illinois CFA.

195.    Illinois Plaintiff and the Illinois Sub-Class Members reasonably relied on Defendants' misrepresentations and omissions of material facts in their advertisements of the Class Vehicles and in connection with their purchases of the Class Vehicles.

196.    Illinois Plaintiff and the Illinois Sub-Class Members had no way of discerning that Defendants' misrepresentations and omissions were false and misleading when they acquired their Class Vehicles because Illinois Plaintiff and the Illinois Sub-Class Members did not have access to Defendants' exclusive and superior knowledge about the Class Vehicles' design and the Defect.

197.    Had Illinois Plaintiff and the Illinois Sub-Class Members known that the Class Vehicles would contain and/or exhibit the Defect, they would not have purchased or leased the Class Vehicles or would have paid less for them. Plaintiff did not receive the benefit of their bargain because of Defendants' misconduct.

198.    Defendants owed Illinois Plaintiff and the Illinois Sub-Class Members a duty to disclose the truth about the Defect because Defendants:

        a.    possessed exclusive and superior knowledge of the design and manufacture of the Class Vehicles and the Defect;

        b.    intentionally concealed the foregoing from Illinois Plaintiff and the Illinois

Sub-Class Members; and/or

c.      made incomplete representations regarding the quality and durability of the Class Vehicles, while purposefully withholding material facts from Illinois Plaintiff and the Illinois Sub-Class Members that contradicted these representations.

199.    Due to Defendants' specific and superior knowledge that the fuel systems in the Class Vehicles will fail due to the Defect, their false representations regarding the increased reliability and durability of the Class Vehicles, and reliance by Illinois Plaintiff and the Illinois Sub-Class Members on these material representations, Defendants had a duty to disclose to Class Members that the Defect will cause fuel system failure in Class Vehicles, that Class Vehicles do not have the expected durability, reliability, and/or safety over other vehicles or of their predecessor engines, that failure of the fuel system will cause damage to Class Vehicle, and that Class Members would be required to bear the cost of the damage to their vehicles. Having volunteered to provide information to Illinois Plaintiff and the Illinois Sub-Class Members, Defendants had the duty to disclose not just the partial truth, but the entire truth. These omitted and concealed facts were material because they directly impact the value of the Class Vehicles purchased or leased by Illinois Plaintiff and the Illinois Sub-Class Members. Longevity, durability, performance, and safety are material concerns to Defendants' consumers. Defendants represented to Illinois Plaintiff and the Illinois Sub-Class Members that they were purchasing or leasing vehicles that were durable, reliable, safe, efficient, of high quality, and containing fuel systems of advanced and superior characteristics and technology to fuel the vehicle and comply with emissions regulations as alleged throughout this Complaint, when in fact it is only a matter of time before the fuel systems fail due to the Defect.

200.    Illinois Plaintiff and the Illinois Sub-Class Members suffered injury in fact to a legally protected interest. As a result of Defendants' conduct, Illinois Plaintiff and the Illinois Sub-Class Members were harmed and suffered actual damages in the form the costs of diagnosis and repair of their vehicles, costs for alternative transportation, and the diminished value of their vehicles.

201. As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Illinois Plaintiff and the Illinois Sub-Class Members suffered and will continue to suffer injury in fact and/or actual damages.

202. Defendants' violations present a continuing risk to Illinois Plaintiff and the Illinois Sub-Class Members as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

203. As a proximate and direct result of Defendants' unfair and deceptive trade practices, Illinois Plaintiff and members of the Illinois Sub-Class purchased or leased Class Vehicles and suffered an ascertainable loss and financial harm. These ascertainable losses include, among other things, overpayment at the time of purchase or lease, the cost to repair the Defect, replacement of the damaged related system components, diminution of Class Vehicle resale value, increased repair and maintenance costs, and other substantial monetary damages and inconvenience.

204. As a direct and proximate result of Defendants' unfair or deceptive acts or practices alleged herein, Illinois Plaintiff and other members of the Illinois Sub-Class suffered and will continue to suffer actual damages and are entitled to recover actual damages to the extent permitted by law pursuant to 815 Ill. Comp. Stat. 505/10(a)a, including class action rules, in an amount to be proven at trial. In addition, Illinois Plaintiff and the putative Class seek equitable and injunctive relief against Defendants on terms that the Court considers reasonable, and reasonable attorneys' fees under 815 Ill. Comp. Stat. § 505/1, *et seq*.

205. Illinois Plaintiff provided notice of her claims by letter dated August 20, 2024.

206. The foregoing acts, omissions, and practices proximately caused Illinois Plaintiff and the Illinois Sub-Class Members to suffer real damages in the form of, *inter alia*, overpaying for the vehicles, as well as diminution of value of the vehicles, and they are entitled to recover such damages, together with all other appropriate damages, attorneys' fees, and costs of suit.

CLASS ACTION COMPLAINT

**FIFTH CAUSE OF ACTION**
**Breach of Express Warranty**
**810 Ill. Comp. Stat. §§ 5/2-313 and 5/2A-212**
**(On Behalf of the Illinois Sub-Class Against KMA)**

207. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

208. Illinois Plaintiff brings this cause of action individually and on behalf of the members of the Illinois Sub-Class against Defendant KMA ("Defendant" for the purpose of this claim).

209. Defendant is and are at all relevant times was a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

210. With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

211. The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

212. Defendant provided all purchasers and lessees of the Class Vehicles with express warranties described herein, which became a material part of the bargain. Accordingly, Defendants' express warranties are an express warranty under Illinois state law.

213. Defendant provides coverage of 5 years or 60,000 miles, whichever comes first, bumper-to-bumper coverage as well as an 8 years/80,000 miles warranty, whichever comes first, of the ECM, and a ten year or 100,000 miles, whichever comes first, powertrain warranty. To secure repairs or service under warranty, Defendant directs Plaintiffs and Class Members to seek such repairs or service at its authorized dealerships.

214. The Defect at issue in this litigation was present at the time the Class Vehicles were sold or leased to Illinois Plaintiff and the Illinois Sub-Class Members.

215. Illinois Plaintiff and the Illinois Sub-Class Members relied on Defendants' express warranties, which were a material part of the bargain, when purchasing or leasing their Class Vehicles.

216. Under the express Warranties, Defendant was obligated to correct the Defect in

CLASS ACTION COMPLAINT

the vehicles owned or leased by Illinois Plaintiff and the Illinois Sub-Class Members.

217. Although Defendant was obligated to correct the Defect, none of the attempted fixes to the Defect are adequate under the terms of the Warranties, as they did not cure the defect.

218. Defendant breached the express warranties by performing illusory repairs. Rather than repairing the vehicles pursuant to the express warranties, Defendant falsely informed Illinois Sub-Class Members that there was no problem with their Class Vehicles, performed ineffective procedures, blamed Illinois Plaintiff and Class Members for the state of their vehicles, and/or replaced defective components in the fuel system with equally defective components, without actually repairing the Class Vehicles.

219. Defendant and its agent dealers have failed and refused to conform the fuel system to the express warranties. Defendant's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

220. Moreover, Defendant's attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, Defendant's warranty limitation is unenforceable because it knowingly sold a defective product without informing consumers about the defect.

221. The time limits contained in Defendant's warranty period were also unconscionable and inadequate to protect Illinois Plaintiff and the Illinois Sub-Class Members. Among other things, Illinois Plaintiff and the Illinois Sub-Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendant. A gross disparity in bargaining power existed between Defendant and the Class Members, and Defendant knew or should have known that the Class Vehicles were defective at the time of sale and that the Defect would likely manifest itself after the expiration of the express warranties.

222. Illinois Plaintiff and the Illinois Sub-Class Members have complied with all obligations under the express warranties, or otherwise have been excused from performance of said obligations because of Defendant's conduct described herein.

CLASS ACTION COMPLAINT

223.    Illinois Plaintiff and the Illinois Sub-Class Members were not required to notify Defendant of the breach because affording Defendant a reasonable opportunity to cure their breach of written warranty would have been futile. Defendant was also on notice of the Defect from the complaints and service requests it received from Plaintiffs and the Class Members, from repairs and/or replacements of the fuel system or components thereof, and through other internal and external sources.

224.    Because Defendant, through its conduct and exemplified by its own service bulletins, have covered repairs of the Defect if Defendant determines the repairs are appropriately covered under the express warranties, Defendant cannot now deny that the express warranties cover the Defect.

225.    Because Defendant have not been able to remedy the Defect, any limitation on remedies included in the express warranties causes those warranties to fail their essential purposes, rendering them null and void.

226.    As a direct and proximate cause of Defendant's breach, Illinois Plaintiff and the Illinois Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiff and the Illinois Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair.

227.    As a direct and proximate result of Defendant's breach of express warranties, Illinois Plaintiff and the Illinois Sub-Class Members have been damaged in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
**Breach of Implied Warranty of Merchantability,
810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212
(On Behalf of the Illinois Sub-Class against Defendants KMA and KMC)**

228.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

229.    Illinois Plaintiff brings this cause of action individually and on behalf of the members of the Illinois Sub-Class against Defendants KMA and KMC ("Defendants" for the

Page 51

purposes of this claim).

230. Defendants are and were at all relevant times "merchants" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

231. With respect to leases, Defendants are and were at all relevant times "lessors" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

232. The Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

233. A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

234. Defendants knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. Defendants directly sold and marketed vehicles equipped with the Defect to customers through authorized dealers, like those from whom Illinois Plaintiff and the Illinois Sub-Class Members bought or leased their vehicles, for the intended purpose of consumers purchasing or leasing the vehicles. Defendants knew that the Class Vehicles would and did pass unchanged from Defendants to the authorized dealers to Illinois Plaintiff and the Illinois Sub-Class Members, with no modification to the defective fuel systems.

235. Defendants provided Plaintiffs and Class Members with an implied warranty that the Class Vehicles and their components and parts were merchantable and fit for the ordinary purposes for which they were sold.

236. This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their fuel systems that were manufactured, supplied, distributed, and/or sold by Defendants were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles and their fuel systems would be fit for their intended use while the Class Vehicles were being operated.

237. Contrary to the applicable implied warranties, the Class Vehicles and their fuel systems, at the time of sale and thereafter, were not fit for their ordinary and intended purpose

of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles are defective, including, but not limited to, the defective design, installation, and manufacture of their fuel systems and the existence of the Defect at the time of sale or lease and thereafter. Defendants knew of this Defect at the times these sale or lease transactions occurred.

238. As a result of Defendants' breach of the applicable implied warranties, Illinois Plaintiff and the Illinois Sub-Class Members suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, because of the Defect, Illinois Plaintiff and the Illinois Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles' fuel systems components are substantially certain to fail before their expected useful life has run.

239. Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

240. Illinois Plaintiff and the Illinois Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations because of Defendants' conduct described herein.

241. Illinois Plaintiff and the Illinois Sub-Class Members were not required to notify Defendants of the breach because affording Defendants a reasonable opportunity to cure their breach of implied warranty would have been futile. Defendants were also on notice of the Defect from the complaints and service requests they received from Plaintiffs and the Class Members, from repairs and/or replacements of the fuel systems or components thereof, and through other internal sources.

242. In addition, on or about August 20, 2024, Illinois Plaintiff gave notice to Defendant that she intended to pursue her warranty claims individually and on behalf of a class of similarly situated consumers.

243. Because Illinois Plaintiff purchased her vehicle new and received the warranties provided directly to her by Defendants, she has privity with Defendants and is also the intended

CLASS ACTION COMPLAINT

third-party beneficiary of Defendants' implied warranties and the contracts between Defendants and their authorized dealers for the purposes of warranty repairs.

244.    As a direct and proximate cause of Defendant's breach, Illinois Plaintiff and the Illinois Sub-Class Members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Illinois Plaintiff and the Illinois Sub-Class Members have incurred or will incur economic damages at the point of repair in the form of the cost of repair. As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Illinois Plaintiff and the Illinois Sub-Class Members have been damaged in an amount to be proven at trial.

**Claims on Behalf of the Nationwide Sub-Class**

**SEVENTH CAUSE OF ACTION**
**(For Fraud by Omission or Fraudulent Concealment)**
**(On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendants)**

245.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

246.    Plaintiffs bring this cause of action on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendants.

247.    Defendants knew that the Class Vehicles suffered from an inherent Fuel System Defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

248.    Defendants concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

249.    Defendants were under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

   a.  Defendants were in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

   b.  The omitted facts were material because they directly impact the safety of the

Page 54

Class Vehicles;

c.  Defendants knew the omitted facts regarding the Fuel System Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

d.  Defendants made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

e.  Defendants actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

250.    The facts concealed or not disclosed by Defendants to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease the Class Vehicles or pay a lesser price for them. Whether a fuel system, including its EVAP system, works properly and will not cause vapor leaks or compromise the integrity of the fuel tank is a material safety concern. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

251.    Defendants concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs and Class Members' purchase or lease of Defendants' defective Class Vehicles.

252.    Defendants continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendants continue to cover up and conceal the true nature of the problem today.

253.    As a direct and proximate result of Defendants' misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective Vehicles and recover damages.

254.    Defendants' acts were done maliciously, oppressively, deliberately, with intent

to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## EIGHTH CAUSE OF ACTION
### (For Unjust Enrichment)
### (On Behalf of the Nationwide Class, or, in the Alternative, on Behalf of All Sub-Classes Against Defendants)

255.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

256.    Plaintiffs bring this cause of action on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendants.

257.    Defendants have received and retained a benefit from Plaintiffs and the members of the Class, and inequity has resulted.

258.    As a direct and proximate result of Defendants' failure to disclose known defects, Defendants have profited through the sale and lease of the Class Vehicles, the value of which was artificially inflated by Defendants' concealment of and omissions regarding the Fuel System Defect. Defendants charged higher prices for the vehicles than the vehicles' true value, and Plaintiffs and Class Members thus overpaid for the Class Vehicles. Although these vehicles are purchased through Defendants' authorized dealers and distributors, the money from the vehicle sales flows directly back to Defendants.

259.    Additionally, as a direct and proximate result of Defendants' failure to disclose known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendants.

260.    Defendants have been unjustly enriched due to the known defects in the Class Vehicles through their receipt of money paid that earned interest or otherwise added to Defendants' profits when said money should have remained with Plaintiffs and Class Members.

261.    Plaintiffs and Class Members were not aware of the true facts regarding the

Defect in the Class Vehicles and did not benefit from Defendants' unjust conduct.

262.    As a result of the Defendants' unjust enrichment, Plaintiffs and Class Members have suffered damages.

263.    Plaintiffs do not seek restitution under their unjust enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendants obtained because of their unjust conduct.

264.    Additionally, Plaintiffs seek injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendants identify. Plaintiffs also seek injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendants from selling the Class Vehicles with the misleading information; compelling Defendants to provide Class members with replacement components that do not contain the defects alleged herein; and/or compelling Defendants to reform their warranties, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranties have been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

**Claims on Behalf of the Plaintiffs in their Individual Capacities**

**THIRTEENTH  CAUSE OF ACTION**
**(Breach of Warranty under the Magnuson-Moss Warranty Act,**
**15 U.S.C. § 2303 *et seq*.)**
**(On Behalf of the Plaintiffs in their Individual Capacities)**

265.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

266.    Plaintiffs bring this cause of action on behalf of themselves in their individual capacities.

267.    The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

268.    Plaintiffs and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

269.    Defendants are "suppliers" and "warrantors" within the meaning of the

CLASS ACTION COMPLAINT

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

270.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for use. This implied warranty included, among other things: (i) a warranty that the Class Vehicles, including the fuel system, manufactured, supplied, distributed, and/or sold by Defendants would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles, including the fuel system, would be fit for their intended uses while the Class Vehicles were being operated. Defendants also expressly warranted that the Class Vehicles, including the fuel systems, would be free from defects in material or workmanship, as set forth above.

271.    Contrary to the applicable implied warranties, the Class Vehicles' fuel systems at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class members with reliable, durable, and safe transportation. Instead, the Class Vehicles contain a defective fuel system. Likewise, contrary to the express warranties, the Class Vehicles' fuel system was not free from defects in material and workmanship.

272.    Defendants' breach of express and implied warranties has deprived Plaintiffs and Class members of the benefit of their bargain.

273.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000. In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

274.    Defendants have been afforded a reasonable opportunity to cure their breach, including when Plaintiffs and Class members brought their vehicles in for diagnoses and repair.

275.    As a direct and proximate cause of Defendants' breach of implied warranties, Plaintiffs and Class members sustained and incurred damages and other losses in an amount to be determined at trial. Defendants' conduct damaged Plaintiffs and Class members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

276.    As a result of Defendants' violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiffs and Class members have incurred damages.

277. Plaintiffs also provided notice to Defendants of its breach of warranty claims under the MMWA by letters dated August 23, 2024 and August 29, 2024.

**RELIEF REQUESTED**

278. Plaintiffs, on behalf of themselves and all others similarly situated, request the Court enter judgment against Defendants, as follows:

(a) An order certifying the proposed Class and Sub-Classes, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

(b) A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the fuel system, including the need for repairs;

(c) An order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendants to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendants to repair and eliminate the Fuel System Defect from every Class Vehicle; enjoining Defendants from selling the Class Vehicles with the misleading information; and/or compelling Defendants to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

(d) An award to Plaintiffs and the Class for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(e) Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act on behalf of each Plaintiff in their individual capacities;

(f) A declaration that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from the sale or lease of the Class Vehicles or make full restitution to Plaintiffs and Class Members;

(g) An award of attorneys' fees and costs, as allowed by law;

(h) An award of pre-judgment and post-judgment interest, as provided by law;

(i) Leave to amend the Complaint to conform to the evidence produced at trial; and

(j) Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

279.    Pursuant to Federal Rule of Civil Procedure 38(b) and Central District of California Local Rule 38-1, Plaintiffs hereby demand a trial by jury of all issues in this action so triable.

Dated: January 9, 2025

Respectfully submitted,

**Capstone Law APC**

By: /s/ Cody R. Padgett

Cody R. Padgett (SBN 275553)
Majdi Hijazin (*pro hac vice* forthcoming)
Nate N. Kiyam (SBN 317677)
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Telephone:  (310) 556-4811
Facsimile:    (310) 943-0396
Email:  Cody.Padgett@capstonelawyers.com
            Majdi.Hijazin@capstonelawyers.com
            Nate.Kiyam@capstonelawyers.com

Russell D. Paul (*pro hac vice* forthcoming)
Amey J. Park (*pro hac vice* forthcoming)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel:  (215) 875-3000
Fax:  (215) 875-4604
Email:  rpaul@bm.net
            apark@bm.net

Greg Coleman (*pro hac vice* forthcoming)
Will Ladnier (*pro hac vice* forthcoming)
Adam Edwards (*pro hac vice* forthcoming)
MILBERG COLEMAN BRYSON PHILIPS GROSSMAN
800 S. Gay St., Suite 1100
Knoxville, TN 37929

Page 60

Tel: (866) (252- 0878
Email: gcoleman@milberg.com
       wladnier@milberg.com
       aedwards@milberg.com

Scott R. Jeeves (*pro hac vice* forthcoming)
JEEVES MANDEL LAW GROUP PC
701 S. Howard Ave., Suite 201
Tampa, FL 33606
Tel: (813) 249-2929
Email:   sjeeves@jeeveslawgroup.com

Roger L. Mandel (*pro hac vice* forthcoming)
JEEVES MANDEL LAW GROUP PC
2833 Crockett St., Suite 135
Fort Worth, TX 76107
Tel: (214) 253-8300
Email:   rmandel@jeevesmandellawgroup.com

Attorneys for Plaintiffs

CLASS ACTION COMPLAINT